## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ESTATE OF JACK CARMEL,
By Its Personal Representative,
Gary Warlen,

      Plaintiff,

      v.

THE GIII ACCUMULATION TRUST,

      Defendant.

C.A. No. _____

**JURY TRIAL DEMANDED**

### COMPLAINT

Plaintiff, the Estate of Jack Carmel (the "Estate"), files and asserts this Complaint against Defendant, The GIII Accumulation Trust, a Delaware statutory trust, and in support thereof, alleges and says:

### PARTIES

1.    The Estate was established pursuant to Florida law following the death of Jack Carmel, a resident of the State of Florida. Mr. Carmel was at all times relevant to this complaint a citizen of the State of Florida. The personal representative of the Estate is Gary Warlen, a citizen of Florida. The Estate is a citizen of the State of Florida.

2.    Upon information and belief, Defendant, The GIII Accumulation Trust ("GIII"), is a Delaware statutory trust, formed pursuant to the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, *et seq.*, with its principal place of business in Wilmington, Delaware. As a Delaware statutory trust, GIII is a separate legal entity under 12 Del. C. § 3801(g) and can be sued in its own name. The trustee of GIII is a Delaware limited trust company with a principal place of business in Wilmington, Delaware.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiff, a citizen of Florida, and the Defendant, a citizen of Delaware.

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Delaware.

## FACTS COMMON TO ALL CLAIMS

5.      As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011).  Insurance policies which are procured as a wager on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate the state's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale.  *Id*.

6.      Although speculators have been around for hundreds of years, never has the problem been more wide-spread or involved such vast amounts of money than in recent years.  In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors.  *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

7.      It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand.  In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28

A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies."[1] *Id.*

8.    One such STOLI promoter was a Delaware company known as Park Venture Advisors, LLC ("PVA"), whose purpose was, upon information and belief, to create, procure, and aggregate a large portfolio of life insurance policies for the benefit of GIII, a Delaware statutory trust also operating out of Wilmington.

9.    Entities such as PVA and/or GIII—known in the STOLI industry as "funders"— worked with a nationwide network of rogue insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and causing those seniors to become involved in the STOLI transactions the funders were orchestrating.

10.    The STOLI transactions orchestrated by funders like PVA and/or GIII were presented to these hand-selected senior citizens in rosy terms that camouflaged the transaction's impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

11.    The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another.  But each shared basic similarities including that the policies at issue were procured by third parties without insurable interest in the insured.

12.    In Delaware and other places, not only do these STOLI policies violate constitutional bans on wagering and insurable interest laws, but they take advantage of senior citizens and otherwise distort the proper use of life insurance—which is to provide actual

---

[1] STOLI is an acronym that is often used to refer to stranger originated life insurance.

protection to an insured's family in the event an untimely death—into a cash machine whereby a stranger to the insured is actually more interested in seeing the insured dead than alive.

13.     In the mid-2000s, Mr. Carmel was a senior citizen in his mid-eighties living in Sunny Isles Beach, Florida.

14.     Upon information and belief, in or around 2006, funders including PVA/GIII, by way of their agents, used Mr. Carmel to procure millions of dollars of life insurance—not for Mr. Carmel or his family—but rather for themselves as investors.

15.     Upon information and belief, PVA/GIII procured at least one policy on Mr. Carmel's life, including a $7 million dollar policy from Massachusetts Mutual Life Insurance Company (the "Policy").

16.     Neither PVA nor GIII had an insurable interest in Mr. Carmel's life, and neither of them would have been able to acquire the Policy had they not used Mr. Carmel to generate it in the first instance.

17.     On May 5, 2018, Mr. Carmel passed away.

18.     Upon information and belief, a claim for the Policy's death benefit was subsequently made by or on behalf of Defendant GIII.

19.     Upon information and belief, that claim was subsequently paid by the issuing insurance company, directly or indirectly, to Defendant GIII.

20.     Subsequently, the Estate discovered, on information and belief, that the Policy was procured by PVA/GIII through a STOLI scheme and that, under Delaware law, the Policy lacked an insurable interest prior to and at its inception and that the Policy was merely a wager on Mr. Carmel's life.

## FIRST CAUSE OF ACTION:  RECOVERY OF INSURANCE PROCEEDS
## <u>DUE TO LACK OF INSURABLE INTEREST</u>

21.    The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

22.    On information and belief the Policy is controlled by and subject to Delaware law.

23.    The Delaware Insurance Code provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured."  18 Del. C. § 2704.

24.    The Delaware Supreme Court has clarified that this insurable interest requirement is not satisfied where a third party without insurable interest uses an insured as an instrumentality to procure a policy for itself as a wager on the insured's life.  *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059 (Del. 2011).

25.    Where an insurance company pays the death benefit on a policy lacking insurable interest, the estate of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee as a matter of common law and statute, 18 Del. C. § 2704 (b).

26.    On information and belief, the Policy at issue in this case was procured by PVA and/or GIII without insurable interest as a wager on Mr. Carmel's life.

27.    On information and belief, the death benefits on the Policy was paid, transferred, or otherwise assigned to Defendant GIII.

28.    As a consequence, the Estate is entitled to recover the death benefit (plus applicable interest, attorneys' fees, and other costs and damages) from Defendant GIII, which is liable to the Estate.

## SECOND CAUSE OF ACTION – IN THE ALTERNATIVE, UNJUST ENRICHMENT

29.     The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length, and sets forth this cause of action in the alternative to the Estate's preceding claim.

30.     Defendant GIII's acceptance and retention of the Policy's death benefit has enriched GIII, to the detriment of the Estate.   Given the circumstances surrounding the procurement of the Policy, allowing GIII to retain the proceeds of the Policy is inequitable and without justification including because, among other things, the Policy was procured without insurable interest by PVA and/or GIII to wager on Mr. Carmel's life, in violation of applicable law and public policy.

31.     Accordingly, the Estate is entitled to an award of the Policy's entire death benefit (plus applicable interest, attorneys' fees, and other costs and damages) from the Defendant, who is liable to the Estate.

Dated: May 6, 2021

*/s/ Donald L. Gouge, Jr. (#2234)*
DONALD L. GOUGE, JR. (DSB #2234)
DONALD L. GOUGE, JR., LLC
800 N. King Street, Suite 303
Wilmington, DE 19801
Phone: (302) 658-1800, Ext. 1
dgouge@gougelaw.com

and

MICHAEL J. MILLER (*pro hac vice* forthcoming)
GREGORY J. STAR (*pro hac vice* forthcoming)
ALEX H. HAYDEN (*pro hac vice* forthcoming)
One Liberty Plaza
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone:  (215) 665-2000
Facsimile:  (215) 372-2349
*Attorneys for Plaintiff, the Estate of Jack Carmel, but its Personal Representative Gary Warlen*