IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ESTATE OF JACK CARMEL, by its Personal Representative, Gary Warlen,<br><br>Plaintiff,<br><br>v.<br><br>THE GIII ACCUMULATION TRUST and WELLS FARGO BANK, N.A., as Securities Intermediary,<br><br>Defendants. | C.A. No. 21-658-MN-JLH |

**REPORT AND RECOMMENDATION**

Pending before the Court is Defendants' Renewed Motion to Compel Arbitration. (D.I. 46.) The motion is fully briefed (D.I. 47, 48, 49, 50), and I heard oral argument on November 10, 2022. (Tr. __.) For the reasons set forth below, I recommend that Defendants' Motion be GRANTED and the case stayed pending arbitration.

I.   BACKGROUND

Jack Carmel died in 2018. During his life, he was a successful businessman. He was the founder and CEO of an aluminum business that he later sold, and then the co-founder and CEO of a lucrative accounts receivable factoring business. (D.I. 48, Ex. 3 at 31–34.)

In April 2006, Carmel applied for and received a $7 million life insurance policy with Massachusetts Mutual Life Insurance Company (the "Policy"). (*Id.*, Ex. 5.) In the policy application, Carmel represented that his "Annual Earned Income" was $2.875 million and that his "Financial Net Worth" was over $45 million. (*Id.*) He listed the "Jack Carmel 2006-1 Insurance Trust" as the owner and beneficiary of the Policy. (*Id.*) Carmel also represented that he was not

applying for the Policy to benefit a life settlement company,[1] and that he did not have any plans to sell the Policy. (*Id.*)

Carmel sold the Policy a few months later. In July 2006, he executed an "Exclusive Rights Agreement" with a life settlement company called Simba Life Plans, LLC ("Simba") to market the Policy for sale.[2] (*Id.*, Ex. 6.) Simba's efforts resulted in a Beneficial Interest Purchase Agreement ("BIPA"), pursuant to which the beneficial interest in the Jack Carmel 2006-1 Insurance Trust (the Policy's beneficiary) was sold to Defendant The GIII Accumulation Trust ("GIII") for $543,542. (*Id.*, Ex. 1 at 1.)

The copy of the BIPA in the record presently before the Court was in the possession of GIII. (*Id.* ¶ 4, Ex. 1.) It is a lengthy document, containing six Articles, including purchase, sale, and closing details, the parties' representations, warranties, acknowledgements, and covenants, indemnification and damages provisions, and a variety of miscellaneous provisions, including an arbitration provision. (*Id.*, Ex. 1.) The cover page states that the BIPA is "DATED AS OF October 19, 2006," but the date fields were not completed in the preamble and several other places. Carmel's undated signature appears on an unnumbered page towards the end of the document, and

---

[1] The life settlement market is the secondary market for life insurance. "This secondary market allows policy holders who no longer need life insurance to receive necessary cash during their lifetimes. The market provides a favorable alternative to allowing a policy to lapse, or receiving only the cash surrender value." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel. Christiana Bank & Tr. Co.*, 28 A.3d 1059, 1069 (Del. 2011). While the secondary market for life insurance is legal, market demand for high value policies has resulted in the creation of policies for the benefit of those who have no relationship to the insured. Such policies, commonly referred to as stranger originated life insurance ("STOLI") policies, "lack an insurable interest and are thus an illegal wager on human life." *Id.* at 1069–70.

[2] Simba is a now-infamous purveyor of STOLI policies that have spawned a proliferation of litigation in federal and state courts. *See Wells Fargo Bank, N.A. v. Estate of Malkin*, 278 A.3d 53, 57 (Del. 2022) ("Simba's business model has, unfortunately, become well known in both Florida and Delaware." (citing cases)).

his signature appears again on the next page, which is dated October 12, 2006.[3] The Trust Officer for the Jack Carmel Family Trust and a Wells Fargo Delaware Trust Company Vice President also signed that page on behalf of GIII. (*Id.*)

Section 6.10 of the BIPA is an arbitration provision. It provides, in its entirety, as follows:

> <u>Arbitration</u>.  THE PARTIES HEREBY AGREE THAT ANY QUESTIONS OR CONTROVERSIES ARISING UNDER THIS AGREEMENT SHALL BE SUBMITTED TO ARBITRATION CONDUCTED BEFORE THE AMERICAN ARBITRATION ASSOCIATION (THE "AAA").  SUCH ARBITRATION WILL BE CONDUCTED UNDER THE RULES OF THE AAA AND THE LAWS OF THE STATE OF DELAWARE.  EACH PARTY HERETO UNDERSTANDS THAT CLAIMS SUBMITTED TO ARBITRATION ARE NOT HEARD BY A JURY AND ARE NOT SUBJECT TO THE NORMAL RULES GOVERNING THE COURTS. EACH PARTY HERETO FURTHER AGREES THAT NO CLAIM MAY BE BROUGHT AS A CLASS ACTION, AND THAT NO PARTY HERETO SHALL HAVE THE RIGHT TO ACT, NOR SHALL THEY ATTEMPT TO ACT, AS A CLASS REPRESENTATIVE OR PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS WITH RESPECT TO ANY CLAIM ARISING UNDER THIS AGREEMENT.

(*Id.*, Ex. 1 at 15–16.) Section 6.7 provides that the BIPA is "binding upon and will inure to the benefit of the parties and their respective successors and permitted assigns." (*Id.* at 15.)

The BIPA has a table of contents that lists an additional ten exhibits and one schedule. Several of the listed exhibits are attached to the copy of the BIPA in the record, and they are filled out with Carmel's information. (*Id.*, Ex. 1.) For example, Exhibit C contains "Backup Contact Sheet[s]" for Carmel, his family members, doctor, and attorney. (*Id.*) Other exhibits listed in the table of contents are incomplete, and some are missing entirely. However, the record separately contains a "Form of Verification Provider Certificate," dated October 19, 2006, in which a Wells

---

[3] The parties don't dispute that those pages were, in fact, signed by Carmel. (D.I. 48, Ex. 9.)

Fargo Assistant Vice President verified that "all Eligible Participant Closing Documents and Service Provider Closing Documents required to be delivered prior to the Acquisition date are in the possession of the Verification Provider[.]" (*Id.*, Ex. 11.) Accompanying that document are many of the completed exhibits missing from the BIPA, such as an Authorization for Disclosure of Protected Health Information and an Irrevocable Durable Limited Power of Attorney. (*Id.*, Ex. 12–17.) Those documents appear to have been completed and signed by Carmel, and they were notarized by Carmel's longtime personal attorney, Lawrence Weiner. (*Id.*; *id.*, Ex. 3 at 29, 38–39.) All are dated September 12, 2006. (*Id.*, Ex. 12–17.)

In October 2006, GIII sent a check in the amount of $539,542 to Jack Carmel, which he deposited.[4] (*Id.*, Ex. 21; *id.*, Ex. 9 at 5.) Later that year, Carmel reported as income on his tax returns a short-term gain of $543,542. (*Id.*, Ex. 23; *id.*, Ex. 3 at 115–118.)

After Carmel died in May 2018, the $7 million death benefit was paid to Defendant Wells Fargo, N.A. ("Wells Fargo"), the securities intermediary for the Policy. The record does not reflect who currently has the funds.

On May 6, 2021, Carmel's estate—acting through its personal representative, Gary Warlen (the "Estate")—initiated this action against Defendants GIII and Wells Fargo. The Estate seeks to recover the $7 million death benefit payment under 18 Del. C. § 2704(b), which, as explained below, permits an individual's executor to maintain an action to recover death benefit payments made under an insurance policy that lacks an insurable interest.

On July 23, 2021, Defendants moved to compel arbitration pursuant to the arbitration provision in the BIPA. (D.I. 16.) The Estate opposed. It argued, among other things, that Carmel

---

[4] $539,542 represents the $543,542 purchase price in the BIPA less $4,000 in trustee fees paid directly to Christiana Bank and Trust. (D.I. 48, Ex. 19.)

had never agreed to the BIPA. In accordance with the Third Circuit's guidance in *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013), the Court denied Defendants' motion to compel arbitration without prejudice to renew after the parties had an opportunity to conduct limited discovery on the narrow factual issue of whether Carmel agreed to arbitrate with GIII. (D.I. 33; *see also* D.I. 27; D.I. 32.)

On June 30, 2022, Defendants filed a renewed motion to compel arbitration. (D.I. 46.)

## II.     LEGAL STANDARDS

"The Federal Arbitration Act reflects the 'national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts.'" *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 519 (3d Cir. 2019) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). Its primary substantive provision says that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy . . . arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It requires that the Court, "upon being satisfied that [an] issue involved in [a] suit or proceeding is referable to arbitration" under an arbitration agreement, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. It also authorizes courts to issue orders compelling arbitration when one party has failed to comply with an arbitration agreement. 9 U.S.C. § 4; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967).

To determine whether an issue in a suit or proceeding is "referable to arbitration" within the meaning of § 2, courts "must consider two 'gateway' questions: (1) 'whether the parties have a valid arbitration agreement at all' (i.e., its enforceability), and (2) 'whether a concededly binding

5

arbitration clause applies to a certain type of controversy' (i.e., its scope)." *Remicade*, 938 F.3d at 519 (quoting *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416–17 (2019)). Even where an arbitration provision contains a clause delegating the issue of arbitrability to the arbitrators, "courts retain the primary power to decide questions of whether the parties mutually assented to a contract containing or incorporating a delegation provision." *MZM Constr. Co., Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 402 (3d Cir. 2020).

The Third Circuit has explained the procedure for determining whether the parties formed an agreement to arbitrate as follows:

> Under our decision in *Guidotti*, when it is clear on the face of the complaint that a validly formed and enforceable arbitration agreement exists and a party's claim is subject to that agreement, a district court must compel arbitration under a Rule 12(b)(6) pleading standard "without discovery's delay." 716 F.3d at 776 (quotation marks and citation omitted). But if the complaint states a claim or the parties come forward with facts that put the formation of the arbitration agreement in issue, the court may authorize "limited discovery" to resolve that narrow issue for purposes of deciding whether to submit the matter to arbitration. *Id.* After discovery, the court may consider the question anew, using a summary judgment standard under Rule 56. *Id.* If a genuine issue of material fact remains, the court must proceed summarily to trial on "the making of the arbitration agreement." *Id.* (citing 9 U.S.C. § 4).

*MZM*, 974 F.3d at 406.

### III. DISCUSSION

Because GIII's argument for arbitration relies on the BIPA, I first consider whether Carmel agreed to the BIPA in the first place. If he did not, Defendants' motion to compel arbitration must be denied. If he did, I must next consider whether Carmel's agreement to arbitrate is binding on the Estate with respect to its claim against Defendant GIII under 18 Del. C. § 2704(b). If the arbitration agreement does not apply to the Estate's claim, Defendants' motion to compel

6

arbitration must be denied. If it does, I must also consider whether Defendant Wells Fargo, a non-signatory to the BIPA, may also invoke the arbitration agreement. I take each in turn.

### A. Carmel agreed to arbitrate claims arising under the BIPA.

The first issue the Court must resolve is whether the BIPA, which contains the arbitration provision at issue, was validly formed. Carmel's Estate contends that Carmel never agreed to it.

The parties had the opportunity to take discovery on the issue of mutual assent and the parties' briefing refers to outside-the-complaint evidence. Under *Guidotti*, the Court must now consider the issue under the summary judgment standard. Under Rule 56, Defendants—the parties seeking to compel arbitration—have the initial duty to present evidence that would allow a trier of fact to find that the parties mutually assented to the BIPA. *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 839 (6th Cir. 2021); *United States v. Donovan*, 661 F.3d 174, 184–85 (3d Cir. 2011) ("The initial burden is on the party seeking summary judgment to point to the evidence 'which it believes demonstrate[s] the absence of a genuine issue of material fact.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986))). The burden then shifts to the non-moving party—here, the Estate—who must point to specific facts in the record that would allow a rational trier of fact to find that Carmel did not intend to be bound by the BIPA. *Boykin*, 3 F.4th at 839; *Guidotti*, 716 F.3d at 773 ("[T]he non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" (quoting *Celotex*, 477 U.S. at 322)).

Delaware law applies to the question of whether the parties intended to be bound by the BIPA (*i.e.*, the "container" contract). *MZM*, 974 F.3d at 402. That question assesses the parties' intent as to the contract as a whole, rather than analyzing whether the parties possessed the requisite intent to be bound to each particular term. *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d

7

1209, 1229 (Del. 2018). "[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound." *Id.* at 1230.

Defendants have pointed to more than enough evidence to demonstrate that Carmel intended to be bound by the BIPA. Most importantly, GIII has produced an executed copy of the BIPA signed by all parties, including Carmel. (D.I. 48, Ex. 1.) Defendants also presented uncontroverted circumstantial evidence of Carmel's intent to be bound. Carmel was a wealthy, knowledgeable businessman with significant experience with financial transactions. He was represented by a cadre of professional advisors, including his personal attorney. The record reflects that all documentation required by the BIPA was compiled, signed by Carmel, notarized by his personal attorney, and sent to the verification agent. In addition, the Estate produced in discovery a prior version of the BIPA (with a lower purchase price) found in Carmel's attorney's files, strongly suggesting that Carmel's attorney reviewed the documents and advised Carmel in connection with the transaction. That prior version was also signed by Carmel and included the same arbitration provision. (*Id.*, Ex. 10; *id.*, Ex. 3 at 70–71.)

Carmel's actions after signing the BIPA also evince his intent to be bound. The uncontroverted evidence establishes that GIII paid Carmel in accordance with the terms of the BIPA, and Carmel accepted the payment and accounted for it on his tax returns. *See, e.g., Carlson v. Hallinan*, 925 A.2d 506, 525 (Del. Ch. 2006) ("Plaintiffs also proved intent to be bound by the agreement by providing credible evidence that the parties acted in accordance with its terms.").

So the burden now shifts to the Estate to point to evidence sufficient to raise a genuine dispute over whether Carmel intended to be bound by the BIPA. The Estate has failed to carry its burden.

The Estate points to the fact that the copy of the BIPA in the record before the Court has inconsistent formatting, such as page numbers that do not match the table of contents, a lack of page numbers and document footers on the signature pages, differences in tone suggesting photocopying of the signature pages, and dates that are blank or missing. According to the Estate, those inconsistencies are evidence that Carmel signed blank signature pages that were later inserted into the BIPA.

I agree with the Estate that the evidence suggests that the parties signed their respective signature pages separately, which were then scanned and compiled into the final document. But that is common practice today, and it is not enough, by itself, to raise a triable issue of fact as to whether Carmel intended to be bound by the agreement. While it is true that the signature pages are missing a document footer stamped on the rest of the pages of the agreement, the BIPA exhibits—signed by Carmel and notarized by his attorney—contain the footer. As for the inconsistencies between the table of contents and page numbers, they appear to be a mere formatting error, as there is no allegation or suggestion, for example, that the misaligned page numbers are the result of someone inserting additional contract language after the document was signed. *See Estate of Malkin by Guarnero v. Sail Funding Tr. II*, No. 15-62092, 2016 WL 8729959, at *5 (S.D. Fla. Feb. 2, 2016) (holding that minor page number discrepancies and a faxed signature page were insufficient to create a genuine issue of fact as to whether the parties mutually assented to an agreement containing an arbitration provision). Indeed, Carmel's attorney had a prior version of the BIPA with the same arbitration provision in his files.

Viewing all the evidence in the light most favorable to the Estate, it suggests, at best, that Carmel, advised by his attorney, might have signed the signature pages without having personally reviewed the BIPA. But a party doesn't have to read a contract in order to form a contract. *Graham*

*v. State Farm Mut. Auto. Ins Co.*, 565 A.2d 908, 913 (Del. 1989) ("A party to a contract cannot silently accept its benefits and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance."). The Estate cites no case for the proposition that a knowledgeable contracting party can avoid a contract that his attorney reviewed, he signed, and he fully performed merely by asserting that he didn't read it. And that is not the law.[5]

In short, Defendants submitted evidence of a written contract containing an arbitration provision, and the Estate failed to point to evidence sufficient to raise a genuine dispute regarding the parties' intent to be bound to that contract.[6]

---

[5] As the United States Supreme Court explained over a century ago:
> It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for the omission.

*Upton, Assignee v. Tribilcock*, 91 U.S. 45, 50 (1875).

The Estate suggests that Carmel was the victim of fraud in the execution. The parties agree that the Estate bears the burden of producing evidence that Carmel was the victim of fraud in the execution. (Tr. 6–7, 62.) But the Estate's brief does not point to any evidence suggesting fraud in the execution. Nothing in the record suggests that Carmel was lied to or prevented from reading the BIPA. (D.I. 48, Ex. 3 at 129–130.)

The Estate also contended for the first time at oral argument that Carmel's attorney, Larry Weiner, was involved in many STOLI insurance transactions and that he may not have truly been acting on Carmel's behalf. (Tr. 52–54.) Even if that argument weren't waived, there is no evidence in the record to support it. The uncontroverted evidence of record shows that Mr. Weiner was Carmel's personal attorney for over 20 years and represented Carmel in a variety of matters.

[6] Even if there were a genuine dispute regarding whether the BIPA was validly formed, the next step would not be to deny the motion to compel arbitration (as the Estate seems to suggest), but instead to hold a trial on the question of contract formation. *Guidotti*, 716 F.3d at 776. Although the Estate generally requested a jury trial in its complaint, it did not make a subsequent request for a jury trial on the specific issue of the formation of an agreement to arbitrate. It has thus waived any right to a jury trial on that issue. *See Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1349–50 (11th Cir. 2017) ("[I]t is undisputed that Burch's only jury demand came in the form of a general demand in his complaint. Because Burch failed to demand a jury trial on the specific

B.     **The Estate is bound by Carmel's agreement to arbitrate.**

As noted above, the BIPA purports to be "binding upon and will inure to the benefit of the parties and their respective successors and permitted assigns." (D.I. 48, Ex. 1 at 15.) The Estate contends that, even if Carmel would have been bound by his agreement to arbitrate any disputes he had with GIII arising under the BIPA, his agreement is not binding on his Estate for purposes of its claim against GIII under 18 Del. C. § 2704(b).

The parties agree that Delaware law governs this issue and so do I. (Tr. 19–20, 32, 63–64.) The parties also agree, and so do I, that, in general, an estate seeking to bring a claim that belonged to the decedent will stand in the shoes of the decedent and will be bound by his agreements (and will also be subject to defenses that could have been raised against the decedent). *See Shields Dev. Co. v. Shields*, No. 5530, 1981 WL 7636, at *5 (Del. Ch. Dec. 8, 1981) (explaining that an estate "stands in the place of" the decedent and consequentially is "bound by the legitimate family decisions in which [the decedent] participated for his own benefit"). Accordingly, I don't think anyone would dispute, for example, that if the Estate wanted to pursue a breach of contract claim against GIII for failing to perform its obligations to Carmel under the BIPA, the Estate would have to pursue that claim in arbitration.

---

issue related to the making of the arbitration agreement, he waived his right to a jury trial on that issue."). In any event, the Estate represented at oral argument that it was not seeking a jury trial on the issue of contract formation. (Tr. 55.)

As explained above, a trial is unnecessary here because the Estate has failed to raise a genuine dispute over the issue of contract formation. But even if the Court held a bench trial, it would still reach the same result. That is because the parties are not asking the Court to decide which pieces of evidence to credit—the documents in the record are what they are, and the parties have not submitted conflicting testimony. In other words, the hard evidence is not in dispute. The parties dispute only the inferences to be drawn from the evidence. If presented the same evidence at a bench trial, the Court would find that Carmel intended to be bound by the BIPA.

11

The Estate contends, however, that a claim under 18 Del. C. § 2704(b) is not a claim that belonged to the decedent and is therefore not subject to agreements made by (and defenses applicable to) the decedent. To understand its argument, it is necessary to examine the text of the statute. It provides:

> (b) If the beneficiary, assignee or other payee under any contract [without an insurable interest] receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

18 Del. C. § 2704(b). Pertinent here, it says that if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may bring an action to recover the death benefit from the recipient. The Estate points out that, unlike a contract or negligence claim that belongs to the decedent and survives the decedent's death, the Estate's claim under § 2704(b) accrued only upon Carmel's death. The Estate contends that its claim thus only belonged to it, not to Carmel itself, and is therefore not subject to Carmel's agreement to arbitrate.

The Estate analogizes its claim under § 2704(b) to a claim brought under Delaware's wrongful death statute, which provides a cause of action "for the benefit of the spouse, parent, child and siblings of the deceased person." 10 Del. C. § 3724(a). The Estate points out that at least one Delaware court has held that a wrongful death plaintiff is not bound by an agreement to arbitrate made by the decedent. *See Skinner v. Peninsula Healthcare Servs., LLC*, No. N20C-09-178, 2021 WL 778324, at *5–6 (Del. Super. Ct. Mar. 1, 2021) ("Since a wrongful death action is an independent and direct claim by the decedent's relatives, the wrongful death beneficiaries in this case are not bound by the arbitration agreement simply because it was signed on behalf of the decedent."). The Estate argues that, because a § 2704(b) claim similarly provides a cause of action

12

that does not accrue to the decedent, it likewise should not be subject to an arbitration agreement made by the decedent before his death.

This is a close question. Neither party cited a case addressing whether a decedent's agreement to arbitrate binds the decedent's Estate to arbitrate a claim for death benefits under 18 Del. C. § 2704(b). But I am persuaded that Delaware law would view this as a circumstance in which the Estate is bound by the decedent's agreement to arbitrate, for a couple of reasons. First, the § 2704(b) cause of action is unlike the wrongful death cause of action in that it does not provide a claim to a particular enumerated class of individuals (spouses, parents, *etc*.). Rather, § 2704(b) allows an insured's executor or administrator to pursue a claim on behalf of the estate, which suggests that the claim is derived from a right held by the decedent himself. *Cf.* 10 Del. C. § 3701 (providing that causes of action survive to the executors and administrators of the person to which the cause of action accrued).

Second, the Delaware statute codifies the common law rule that the assignment of a policy that lacks an insurable interest is invalid and that, in such circumstances, the purported assignee is deemed to hold the policy for the benefit of the insured himself, a right which then passes to the insured's estate when he dies. *Warnock v. Davis*, 104 U.S. 775, 782 (1881); *Malkin*, 278 A.3d at 61 (citing *Warnock*). That likewise suggests that the estate's claim is derivative of that of the insured.

The Estate contends that depriving it of a judicial forum on this issue would defeat the public policy behind § 2704(b), which is to deter wagering on human life. But sending the dispute to arbitration does not prevent the Estate from vindicating its statutory remedy; it merely changes the forum. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded

13

by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."). And the Estate has cited no authority that would permit the Court to hold that § 2704(b) claims are not subject to valid arbitration agreements.

In sum, I reject the Estate's argument that it is not bound by Carmel's agreement to arbitrate claims arising under the BIPA. The Estate must pursue its § 2704(b) claim against GIII in arbitration.

### C. As GIII's agent, Wells Fargo may invoke the BIPA's arbitration provision.

The Estate next contends that, even if the BIPA requires it to arbitrate its claim against GIII, the Estate is not required to litigate its claim against Wells Fargo, a non-signatory. Defendants respond that the Estate is suing Wells Fargo "solely in its capacity as a securities intermediary" for GIII (D.I. 7, ¶ 3) and that, in such capacity, Wells Fargo is merely acting as an agent for GIII and is therefore entitled to enforce the arbitration agreement. I agree with Defendants.

The question of whether a non-signatory securities intermediary acting as an agent can invoke an agreement's arbitration provision against a signatory is governed by state law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–32 (2009). Under Delaware law, it is "well-settled" that "nonsignatory agents may invoke a valid arbitration agreement entered into by their principal." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 224 (3d Cir. 2007); *BuzzFeed, Inc. v. Anderson*, No. 2022-0357, 2022 WL 15627216, at *9 (Del. Ch. Oct. 28, 2022) (citing *Tracinda*).

The Estate does not dispute that Wells Fargo was acting as GIII's agent with respect to the Policy and that Wells Fargo is being sued only in that capacity. (*See* D.I. 7 (Amended Compl.) ¶ 3 ("Wells Fargo Bank is being named solely in its capacity as Securities Intermediary.").) *Cf.*

*Malkin*, 278 A.3d at 58 n.8 (citing 6 *Del. C.* § 8–102(a)(14)) (explaining that a securities intermediary is "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity"); *Sun Life Assurance Company of Canada v. Wells Fargo Bank, NA*, No. 14-5789, 2016 WL 6824367, at *1 (D.N.J. Nov. 17, 2016) (explaining that a securities intermediary's role is "to act as a custodian, verification agent, and escrow agent of a life insurance policy"). Accordingly, Wells Fargo may invoke the arbitration provision.[7]

### D. The Estate must present the rest of its arguments against arbitration to the arbitrator.

The Estate launches a barrage of additional arguments in an attempt to avoid arbitration. None are persuasive.

The Estate suggests that, because the parties' agreement was likely part of an illegal STOLI agreement, and thus void *ab initio*, Defendants cannot enforce the arbitration agreement in the BIPA. That is wrong. *See Buckeye*, 546 U.S. at 446–49 (enforcing arbitration provision contained in contract that was alleged to be void *ab initio* under state law). As the Third Circuit recently explained in *Zirpoli v. Midland Funding, LLC*, that result

> may seem counterintuitive as it means that a court must defer to an arbitrator even where the agreement containing the arbitration clause is, itself, void or illegal. However, the Supreme Court has clearly rejected that argument, reasoning that the ultimate illegality

---

[7] The Estate contended for the first time at oral argument that to invoke a contractual provision under an agency theory, the non-signatory must have been acting as an agent for the principal at the time the contract was executed. This argument was not made in the briefing and is therefore waived. Even if it weren't, I would reject it. The Estate has not cited any authority for the proposition that a non-signatory can invoke a principal's contractual provision under an agency theory only if the non-signatory was acting in that exact capacity at the time the contract was executed.

Defendants alternatively argue that Wells Fargo may invoke the BIPA's arbitration clause under a theory of equitable estoppel. Because I conclude that Wells Fargo may invoke the BIPA under an agency theory, I don't need to assess the equitable estoppel theory.

15

> of a contract does not automatically negate the parties' agreement that an arbitrator should resolve disputes arising from the contract.

48 F.4th 136, 145 (3d Cir. 2022).

The Estate next contends that Defendants lack "Article III standing" to enforce the BIPA's arbitration provision. Even if I agreed with that argument,[8] it is an argument that the Estate must raise with the arbitrator, as the parties to the BIPA clearly and unmistakably agreed to delegate questions of arbitrability to the arbitrator. *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020) (holding that an agreement's incorporation of the AAA rules "constitutes clear and unmistakable evidence that the parties agreed to delegate arbitrability"); *see also Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529–30 (2019) ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *Env. Barrier Co., LLC v. Slurry Systems, Inc.*, 540 F.3d 598, 605 (7th Cir. 2008) ("[C]ourts have not hesitated to hold that standing is a matter for the arbitrator to resolve . . . ." (collecting cases)).

The Estate also contends that (for various reasons) the BIPA has terminated and, thus, no one has *any* rights under it. Like the prior argument, that raises a question of arbitrability that must be resolved by the arbitrator.

Finally, to the extent the Estate contends that its claims against Defendants do not "arise under" the BIPA, it must likewise raise that arbitrability question with the arbitrator.

---

[8] *See Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 272 (3d Cir. 2004) (explaining that the doctrine of Article III constitutional standing is not the same thing as the standing required to compel arbitration).

IV.     **CONCLUSION**

For the reasons set forth above, I recommend that Defendants' Renewed Motion to Compel Arbitration (D.I. 46) be GRANTED. This action should be stayed while the arbitration proceeds. 9 U.S.C. § 3; *Lloyd*, 369 F.3d at 269–71.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and District of Delaware Local Rule 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: January 19, 2023

_____
The Honorable Jennifer L. Hall
UNITED STATES MAGISTRATE JUDGE